UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SARAH HAYES and MARK HAYES, individually, and as a parents and next friends of IRIS HAYES, a minor, <br><br> Plaintiffs, <br> v. <br><br> PRESENCE CHICAGO HOSPITAL NETWORK, *et al.*, <br><br> Defendants. | No. 23 C 1749 <br><br> Chief Judge Virginia M. Kendall |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs Sarah and Mark Hayes gave birth to a baby girl, Iris, in 2014. Iris developed brain injuries brought on by deprivation of oxygen in utero during her delivery at St. Francis Hospital in Chicago. The Hayes sued several individuals, the hospital network, and the United States for their daughter's injuries. At issue in this Motion is their medical malpractice claim under the Federal Tort Claims Act (FTCA) against the United States based on the conduct of Dr. Chlebowicz, the attending physician for Iris's delivery. The Hayes' other claims are the subject of a separate motion pending before the Court. The United States moves for summary judgment on the grounds that the Hayes' FTCA claim is time-barred. (Dkt. 44 at 1). For the reasons below, the Court grants the United States' Motion for Summary Judgment [43].

**BACKGROUND**

**I.   Factual History**

Iris Hayes was delivered by Cesarian section at Saint Francis on October 9, 2014. (Dkt. 45 ¶ 1; Dkt. 49 ¶ 1). Dr. Magdalena Agata Chlebowicz was Sarah's attending physician during Iris's delivery at Saint Francis Hospital. (Dkt. 45 ¶ 15). Dr. Chlebowicz provided medical care to

1

Sarah as an employee of ACCESS Community Health Network ("ACCESS"), a private entity that receives federal grant funding from the U.S. Public Health Service, rendering Dr. Chlebowicz a federal employee under the FTCA. (Dkt. 1 at 102; Dkt. 12; Dkt. 13; Dkt. 44 at 6, Dkt. 45 ¶ 45; Dkt. 49 ¶ 45); 42 U.S.C. §§ 233(a), (g); 28 U.S.C. § 1346(b)(1). The Hayes allege that Sarah's medical team, including Dr. Chlebowicz, negligently delayed the Cesarian section and failed to adequately recognize and respond to Iris's signs of fetal distress, resulting in hypoxia in utero, acidosis, and permanent brain damage. (Dkt. 22 ¶¶ 38–45).

During the delivery process, Sarah experienced severe pain, and her labor was stalled for hours before the medical team ultimately decided to perform a Cesarian section. (Dkt. 45 ¶¶ 21–23; Dkt. 49 ¶¶ 21–23; Dep. of Sarah Hayes, Dkt. 50-2 at 26:22–27:10; Dep. of Mark Hayes, Dkt. 50-1 at 150:02–151:01, 152:05–153:16). The Hayes each testified that throughout the day of Iris's birth, they had "concerns about the quality of the medical care provided[,]" including concerns that Dr. Chlebowicz was unusually absent for much of the day, that the medical team did not check in on Sarah frequently enough, and that the medical team did not consider the need for alternatives to conventional delivery in a timely manner. (Dkt. 45 ¶ 15–22; Dkt. 49 ¶ 15–22; Dep. of Sarah Hayes, Dkt. 50-2 at 15:03–20, 68:08–20, 26:22–27:10; Dep. of Mark Hayes, Dkt. 50-1 at 148:12–24, 149:09–16). Sarah testified that a medical resident "had a really hard time placing" the fetal monitor and took a while to do so, and that the medical team had to readjust the monitor several times, including at least one time in the presence of Dr. Chlebowicz. (Dkt. 45 ¶ 19–20; Dkt. 49 ¶ 19–20; Dep. of Sarah Hayes, Dkt. 45-2 at 25:20–26:20). Sarah further testified that prior to the delivery, when her contractions were very severe, she expressed serious concerns about the health of Iris to the medical team, complained about Dr. Chlebowicz's absence, and "did not feel confident in how things were being addressed" because the medical team's responses were not

timely and were sometimes dismissive. (Dep. of Sarah Hayes, Dkt. 50-2 at 15:08–20; 16:10–18:03; Dkt. 45 ¶¶ 16–17; Dkt. 49 ¶¶ 16–17). After Sarah became worried that her labor was not progressing, she expressed concern to the medical team, but even after several hours of stalled labor, the medical team had not discussed alternatives to conventional delivery with her. (Dep. of Sarah Hayes, Dkt. 50-2 at 26:21–28:01). Sarah testified that the medical team eventually mentioned a Cesarian section "late in the day last minute." (Dep. of Sarah Hayes, Dkt. 50-2 at 97:1–19).

The Hayes allege that Iris's medical records show that the Cesarean section was untimely by detailing abnormalities in Iris's heartrate as well as Sarah's prolonged labor, arrest of dilation, and intolerance to the labor induction medication Pitocin. (Dkt. 45 ¶ 27; Dkt. 49 ¶ 27). The Hayes further allege that Iris exhibited signs of neurological injuries at birth, including a dark purple appearance. (Dkt. 45 ¶ 25; Dkt. 49 ¶ 25; Dep. of Mark Hayes, Dkt. 50-1 at 71:15–19). Within hours of her birth, Iris experienced seizures and was moved to a neonatal intensive care unit. (Dkt. 45 ¶¶ 9, 25; Dkt. 49 ¶¶ 9, 25). An MRI subsequently confirmed that Iris suffered hypoxic ischemic encephalopathy, an injury associated with oxygen deprivation. (Dkt. 45 ¶¶ 9–10; Dkt. 49 ¶¶ 9–10; Dep. of Sarah Hayes, Dkt. 50-2 at 43:05–17, 78:13–17, 94:22–95:03).

Sarah testified that shortly after receiving the MRI results, the Hayes understood that a lack of oxygen caused Iris to suffer brain damage and that the "lack of oxygen was most likely caused by her delayed birth." (Dep. of Sarah Hayes, Dkt. 50-2 at 43:05–17, 78:13–17, 94:22–95:03, 30:19–31:01; Dep. of Mark Hayes, Dkt. 50-1 at 97:07–100:10; 156:16–157:01, 158:04–12). Shortly after Iris's birth, Mark told Sarah that the delay of Iris's birth caused Iris's injuries. (Dep. of Sarah Hayes, Dkt. 45-2 at 30:19–31:01). While sharing the MRI results, medical professionals told Mark that Iris would probably develop cerebral palsy and had an 80% chance of being unable

3

to walk, talk, and feed herself. (Dep. of Mark Hayes, Dkt. 50-1 at 97:07–100:10). Sarah further testified that within a year of Iris's birth, she believed that "the delay in performing the C-section" was "related to" Iris's injuries. (Dep. of Sarah Hayes, Dkt. 50-2 at 28:02–18; 29:04–21). Within the same period, Iris displayed additional signs of neurological injuries, including issues associated with her gross motor movement, fine motor movement, and vocalizations. (Dkt. 45 ¶ 26; Dkt. 49 ¶ 26; Dep. of Sarah Hayes, Dkt. 50-2 at 32:19–33:14).

In 2017 or 2018, Mark reached out to his uncle, an attorney and local judge, to see if he could refer Mark to an attorney for assistance related to Iris's birth and injuries. (Dep. of Mark Hayes, Dkt. 50-1 at 159:20–160:17). The uncle informed Mark that he could not prosecute the claim but helped Mark understand the process, told Mark that a claim could be brought up until Iris is 8 years old, and referred him to a local attorney. (*Id.*) Because Iris was only approximately four years old at the time, Mark waited "another year or so" before reaching out to the local attorney, who also told the Hayes that they still had time to sue. (*Id.*; Dkt. 45 ¶¶ 28–32; Dkt. 49 ¶¶ 28–32). The Hayes sought legal advice because, around that time in 2017 or 2018, Iris received a diagnosis of apraxia (a motor disorder caused by brain damage), he and Sarah "had all the doctors' information" and understood that Iris suffered "long-term damage . . . that she's going to have to live with," and Mark believed that "something went wrong during the birth." (Dep. of Mark Hayes, Dkt. 50-1 at 160:20–163:25, 164:01–05; Dep. of Sarah Hayes, Dkt. 50-2 at 45:01–46:16). The Hayes ultimately decided to "see how things went" and did not move forward with any legal action at that time because they felt that they had additional time and that the process was emotionally burdensome. (Dep. of Sarah Hayes, Dkt. 50-2 at 45:01–46:16; Dep. of Mark Hayes, Dkt. 50-1 at 164:01–24; Dkt. 45 ¶¶ 28–32; Dkt. 49 ¶¶ 28–32).

Unfortunately, when Iris was four or five years old in 2018 or 2019, Sarah became certain that Iris suffered from permanent impairments in her visual memory processing, spatial awareness, and cognitive functioning. (Dep. of Sarah Hayes, Dkt. 50-2 at 34:13–37:04; Dkt. 50 ¶ 14; Dkt. 56 ¶ 14). Mark testified that it "sounds about right" that one of Iris's medical records states that a cerebral palsy diagnosis was made when she was approximately seven years old, but as the United States points out, it is not clear whether this was the first cerebral palsy diagnosis, and the document is not in the record. (Dep. of Mark Hayes, Dkt. 50-1 at 47:18–22; Dkt. 57 ¶ 17). These factual disputes, however, are not essential to determining the timeliness of the FTCA claim at issue here. When Iris was seven years old in 2021 or 2022, the Hayes contacted the attorneys who brought this suit. (Dep. of Mark Hayes, Dkt. 50-1 at 165:02–09).

## II. Procedural History

In September 2022, a month before Iris's eighth birthday, the Hayes initiated this action in Illinois state court, bringing the same claims against Presence Chicago and the defendant nurses pending here, plus a medical malpractice claim against Dr. Chlebowicz in her individual capacity. (Dkt. 1 at 8; Dkt. 49 ¶ 41). In March 2023, the United States removed the action to this Court under 42 U.S.C. § 233 and substituted the United States as a defendant in the place of Dr. Chlebowicz, after the Attorney General certified that Dr. Chlebowicz acted as a federal employmee with respect to the events underlying the Hayes' negligence claim. (Dkt. 1 at 1–3, 102). The Hayes later voluntarily dismissed their negligence claim against Dr. Chlebowicz in her individual capacity (Count II), because the Public Health Services Act provides that an action against the United States is the exclusive remedy for a medical malpractice claim arising from the conduct of a Public Health Service employee. (Dkt. 41); 42 U.S.C. § 233(a).

Prior to the removal, in February 2023, the Hayes presented an administrative claim to the Department of Health and Human Services (HHS), which, under 28 U.S.C. § 2675(a), was a

prerequisite for them to bring their FTCA claim against the United States in this Court. (Dkt. 22-3 at 1–4). In April 2023, the Court, based on the parties' stipulation, dismissed the claim against the United States without prejudice and stayed the remaining claims until the Hayes received a final determination of their administrative tort claim and thereby exhausted the administrative remedy for their claim against the United States. (Dkt. 13). In August 2023, HHS denied the Hayes' administrative claim on the basis that "[t]he evidence fails to establish that the alleged injuries were due to the negligent or wrongful act or omission of a federal employee acting within the scope of employment." (Dkt. 22-4 at 1–2).

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Med. Protective Co. of Fort Wayne v. Am. Int'l Specialty Lines Ins. Co.*, 990 F.3d 1003, 1008 (7th Cir. 2021). The Court construes all facts and draws all reasonable inferences in favor of the nonmoving party. *Lewis v. Ind. Wesleyan Univ.*, 36 F.4th 755, 759 (7th Cir. 2022). "A genuine issue of material fact exists only if 'there is sufficient evidence' " for a reasonable jury to return a verdict for the nonmoving party. *BirchRea Partners, Inc. v. Regent Bank*, 27 F.4th 1245, 1249 (7th Cir. 2022) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). A fact is "material" if it might affect the outcome of the suit under the governing law. *Anderson*, 477 U.S. at 248. "Speculation is not sufficient to survive summary judgment; there must be evidence." *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 573 (7th Cir. 2021) (cleaned up and internal citations omitted).

**DISCUSSION**

The United States moves for summary judgement claiming that the Hayes' FTCA claim is time-barred. (Dkt. 44 at 12). The FTCA waives federal sovereign immunity for tort claims arising from "circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where act or omission occurred." 28 U.S.C. § 1346(b)(1); 28 U.S.C. § 2674. And under 28 U.S.C. § 2401(b), "[a] tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues[.]" The Hayes did not present the administrative claim to HHS until February 2023 at the earliest, so the FTCA claim is timely only if it accrued in or after February 2021.[1] (Dkt. 22-3 at 1–4); 28 U.S.C. § 2401(b); *Evans v. United States*, No. 23-1151, 2025 WL 798859, at *4 (7th Cir. Mar. 13, 2025) (holding that the Westfall Act's savings provision, 28 U.S.C. § 2679(d)(5), which extends the FTCA's statute of limitations for actions against federal employees that are removed to federal court pursuant to § 2679(d)(5), does not apply to actions against Public Health Service employees that are removed to federal court pursuant to 42 U.S.C. § 233(c)).

An FTCA claim accrues when a plaintiff either (1) has actual, subjective knowledge that a government act or omission may have caused their injury, *or* (2) has "information that would prompt a reasonable person to inquire further into a potential government-related cause of the injury, whichever happens first." *E.Y. ex rel Wallace v. United States*, 768 F.3d 861, 865–66 (7th

---

[1] The Hayes appear to have mailed the administrative claim to HHS on February 6, 2023, (Dkt. 22-3 at 2), but HHS's disposition letter indicates that the administrative claim was filed on May 22, 2023. (Dkt. 22-4 at 1). "[A] claim shall be deemed to have been presented when a Federal agency *receives* from a claimant . . . an executed Standard Form 95 or other written notification of an incident, accompanied by a claim for money damages in a sum certain for injury to or loss of property, personal injury, or death alleged to have occurred by reason of the incident[.]" 28 C.F.R. § 14.2 (emphasis added). Although it is difficult to imagine that HHS received the administrative claim more than two months after it was mailed, the factual question of which exact day the administrative claim was presented is not material to this dispute, because even assuming the earliest possible date on which HHS could have received the administrative complaint (February 6, 2023), the Hayes' FTCA claim is still untimely.

Cir. 2014); *P.W. by Woodson v. United States*, 990 F.3d 515, 520–21 (7th Cir. 2021); *Arteaga v. United States,* 711 F.3d 828, 831–32 (7th Cir. 2013); *Arroyo v. United States*, 656 F.3d 663, 669, 673 (7th Cir. 2011); *Blanche v. United States*, 811 F.3d 953, 958 (7th Cir. 2016) (noting this standard provides for "either a subjective analysis or an objective analysis"); *United States v. Kubrick*, 444 U.S. 111, 122–23 (1979) (holding that a medical malpractice claim under the FTCA accrues when plaintiff becomes aware of physical injury and its cause). Under the subjective analysis, a plaintiff need not have knowledge of the legal injury (negligence or recklessness), only knowledge of the actual injury and its probable cause. *Massey v. United States*, 312 F.3d 272, 276 (7th Cir. 2002); *Kubrick*, 444 U.S. at 122–23. Under the objective analysis, a traumatic birth experience alone does not trigger the statute of limitations for a medical malpractice claim based on injuries resulting from the negligent delivery of a child. *P.W.*, 990 F.3d at 521. For the statute of limitations to run, a plaintiff must have additional information that would prompt a reasonably diligent person to inquire into whether a doctor's conduct during delivery was a probable cause of the injuries. *Id.*; *Nemmers v. United States*, 795 F.2d 628, 632 (7th Cir. 1986).

      The United States contends that the Hayes' FTCA claim is untimely because they were aware of Iris's injuries shortly after her birth, and they suspected, as early as 2014, that the delay in performing the Cesarean section caused Iris's injuries. (Dkt. 44 at 3, 12). The United States relies on the Hayes' testimony that after receiving the MRI results shortly after Iris's birth, they understood Iris's injuries were caused by a lack of oxygen that most likely resulted from her delayed birth; that within the year after Iris's birth, Sarah believed the delay in the Cesarian section was related to Iris's injuries; and that the Hayes "were both aware of this concern from the beginning." (*Id.* at 3–4; Dep. of Sarah Hayes, Dkt. 50-2 at 30:01–06). The United States also emphasizes the Hayes' testimony that they had serious concerns about the medical care Sarah

8

received, including concerns about Dr. Chlebowicz's absence, the medical team's general lack of monitoring and responsiveness, and the medical team's delayed consideration of alternatives to conventional delivery. (Dkt. 44 at 4). The United States further underscores that in 2017 or 2018, the Hayes consulted with an attorney about Iris's injuries based on the belief that "something went wrong during the birth." (*Id.* at 5; Dep. of Mark Hayes, Dkt. 50-1 at 163:21–25).

The Hayes argue that the FTCA claim did not accrue until the start of their investigation of the cause of Iris's injures in October 2021. (Dkt. 51 at 9). They assert that the Hayes' mere awareness of Iris's injuries is insufficient to start the statute of limitations clock because they lacked actual knowledge that Dr. Chlebowicz's conduct was a probable cause of Iris's injuries and information that would prompt a reasonable person to inquire into whether Dr. Chlebowicz's conduct may have been a probable cause of Iris's injuries. (*Id.* at 2).

## I. Knowledge of the Injuries

First, the Hayes do not meaningfully dispute that they had knowledge of Iris's injuries shortly after her birth in 2014 and certainly when they sought legal advice in 2017 or 2018. The Hayes' testimony clearly establishes that they had actual knowledge of Iris's primary injury—brain damage resulting from a lack of oxygen—when they received the MRI results shortly after her birth in October 2014. (Dep. of Sarah Hayes, Dkt. 50-2 at 43:05–17, 78:13–17, 94:22–95:03, 30:19–31:01; Dep. of Mark Hayes, Dkt. 50-1 at 97:07–100:10; 156:16–157:01, 158:04–12). While the Hayes initially had some uncertainty about the full extent of Iris's injuries and how they would manifest long-term, the Hayes's testimony makes clear that they had knowledge of Iris's long-term complications, including impaired motor function, impaired speech, and impaired cognitive functioning, in the years prior to them seeking legal advice in 2017 or 2018. (Dep. of Mark Hayes, Dkt. 50-1 at 160:20–163:25, 164:01–05; Dep. of Sarah Hayes, Dkt. 50-2 at 45:01–46:16).

The Hayes' assertion that "[o]ther than the seizures that Iris suffered after birth, Sarah did not notice any cognitive health conditions or injuries during the first year of the baby's life[,] (Dkt. 51 at 7), is immaterial because shortly after Iris's birth, the Hayes had knowledge of the injuries alleged in the Amended Complaint: "ongoing hypoxia in utero resulting in a lack of oxygen to her brain and vital organs and ultimately acidosis and permanent brain damage." (Dkt. 22 at 35, ¶ 44). The Hayes testified that not only did they witness Iris's seizures, but they also received MRI results and medical advice detailing that Iris suffered severe brain damage. (Dep. of Sarah Hayes, Dkt. 50-2 at 43:05–17, 78:13–17, 94:22–95:03, 30:19–31:01; Dep. of Mark Hayes, Dkt. 50-1 at 97:07–100:10; 156:16–157:01, 158:04–12).

## II.   Knowledge of a Probable Doctor-Related Cause

Second, the Hayes' own testimony clearly establishes that beginning in 2014 and certainly by 2017 or 2018 when they began seeking legal advice, the Hayes "had reason to suspect, and in fact did suspect, that the delay in performing [the Cesarian section, or at minimum what they perceived to be overall deficient medical care,] was the source of" Iris's injuries. *Massey*, 312 F.3d at 279. Sarah's testimony—that within a year of Iris's birth, she believed that "the delay in performing the C-section" was related to Iris's injuries—is decisive on this issue. (Dep. of Sarah Hayes, Dkt. 50-2 at 28:02–18; 29:04–21).

Additional circumstances—including the complications in the delivery, the Hayes' concerns about Dr. Chlebowicz and the medical team's lack of responsiveness and proactive consideration of alternatives to conventional delivery, the Hayes' subjective understanding that the brain damage Iris suffered at birth was likely related to Iris's delayed birth, and the Hayes' decision to seek legal advice in 2017 or 2018 based on their concerns about the medical care Sarah received—collectively foreclose a genuine dispute over whether the Hayes had actual knowledge that Dr. Chlebowicz's conduct was a probable cause of Iris's injuries by 2017 or 2018, at the latest.

10

*Blanche*, 811 F.3d at 958–59 (finding that shortly after child's birth, a parent had enough information to suspect that a physician caused the child's injuries where delivery was difficult, the child was lodged in the birth canal, the physician induced conventional labor rather than performing a Cesarian section, the unusually large child had to be rushed to an intensive care unit, and the parent consulted with an attorney shortly after the child's birth). These same facts also foreclose a genuine dispute over whether the Hayes had information that would have prompted a reasonable person to inquire into whether Dr. Chlebowicz's conduct was a probable cause of Iris's injuries by 2017 or 2018, at the latest.

The Hayes' contention that the attorney consultation in 2017 or 2018 did not trigger the statute of limitations because the record does not show that the attorney reviewed medical records or discussed the merits of a medical malpractice action is uncompelling, (Dkt. 51 at 8), because the Hayes' testimony about their concerns that Iris's injuries were doctor-related shows that they "did not require [the attorney's] review of the medical records to understand the traumatic delivery as a potential cause of [Iris]'s injury[.]" *P.W.*, 990 F.3d at 520. The Hayes claimed they decided not to pursue legal action when they consulted the first attorney in 2017 or 2018 because they believed they had more time to make the decision and felt the emotional weight of such a process, not because they believed Dr. Chlebowicz was not a probable cause of Iris's injuries. *Blanche*, 811 F.3d at 959 (Plaintiff "claimed she did not retain that attorney because she thought he was not a good lawyer, not because she thought Dr. Marsheh was not involved with Arianna's injury. This indicates that Latoya subjectively believed that Arianna's injury may have been caused by Dr. Marsheh's delivery."); (Dep. of Sarah Hayes, Dkt. 50-2 at 45:01–46:16; Dep. of Mark Hayes, Dkt. 50-1 at 164:01–24; Dkt. 45 ¶¶ 28–32; Dkt. 49 ¶¶ 28–32).

11

The Hayes' reliance on the discussion of medical records requests in *Wallace*, 758 F.3d at 863–64, 868–69, does not help their case, either. (Dkt. 51 at 8–9). There, the Seventh Circuit simply held that an attorney's request for records from a particular entity does not, on its own, require the inference that a plaintiff suspected that entity may have caused the plaintiff's injuries. *Wallace*, 758 F.3d at 868–69. Here, the Court's finding that the Hayes had actual knowledge that Dr. Chlebowicz's conduct was a probable cause of Iris's injuries does not turn on the attorneys' request for medical records in 2021 but the independent factual circumstances arising as early as 2014 that the Court discussed above.

The Hayes' contention—that they did not "suspect a doctor-related cause" because, while they knew a lack of oxygen likely resulting from Iris's delayed birth caused her brain damage, they did not attribute the delayed birth to a delay in the performance of the Cesarian section—fails to raise a genuine dispute of fact because it is directly contradicted by Sarah's own testimony that she believed the delayed performance of the Cesarian section was causally related to Iris's injuries. (Dkt. 51 at 4–8; Dkt. 49 ¶ 8). This contention is also foreclosed by Mark's testimony that the Hayes sought legal advice in 2017 or 2018, because he believed that since Sarah was otherwise healthy during her pregnancy, "something went wrong during the birth." (Dep. of Mark Hayes, Dkt. 50-1 at 160:20–163:25, 164:01–05).

Regardless of whether medical professionals informed Sarah that Iris's brain damage was caused by her delayed birth, Sarah testified that she nonetheless came to suspect that it was based on her understanding that "you have to be careful about timing with babies" and that "she was worried that [Iris] wasn't doing well in those last few hours." (Dep. of Sarah Hayes, Dkt. 50-2 at 28:02–18; 29:04–21). That's enough for the statute of limitations to begin running under the subjective accrual test. *Wallace*, 758 F.3d at 865.

Furthermore, the Hayes' contention—that the FTCA claim did not accrue until their attorneys' investigation of Iris's injuries in 2021—is also unavailing. Proof that Dr. Chlebowicz caused the injury was not required for the state of limitations to begin running; only a suspicion that she was a probable cause of the injury was required. *Kubrick*, 444 U.S. at 122; *Arroyo*, 656 F.3d at 669; *Massey*, 312 F.3d at 276. The Hayes rely on *Wallace*, 758 F.3d at 864–66, 869, and *Drazan v. United States*, 762 F.3d 56, 59 (7th Cir. 1985), to argue that the FTCA claim did not accrue until the start of their attorneys' investigation in 2021, because until then, the Hayes lacked knowledge of "the government link in the causal chain," that is, knowledge that Dr. Chlebowicz's conduct was a probable cause of Iris's injuries. (Dkt. 51 at 6). But *Wallace* was a case, unlike this one, where "government-related cause and doctor-related cause [were not] synonymous" because the plaintiff received care from two different institutions (one governmental and one private) at two different points in time (prenatal and delivery). 758 F.3d at 866–68. These circumstances meant that the plaintiff's suspicion that the private institution was a probable cause of the injuries was enough only for the claims against the private institution to accrue, *Id.* at 866–68, because, as a general rule, "[w]hen there are two causes of an injury, and only one is the government, the knowledge that is required to set the statute of limitations running is knowledge of the government cause, not just of the other cause." *Drazan v. United States*, 762 F.2d 56, 59 (7th Cir. 1985).

But where, as here, "a person suspects, or a reasonable person would suspect, that her injury was caused by negligent medical care, claims regarding other doctor-related causes of that injury that share a time and place with the injury's suspected cause also accrue." *Wallace*, 758 F.3d at 868 ("All claims arising from the same surgery, for example, against surgeon, anesthetist, and nurse, would arise together. However, claims that are distinct in time, or distinct in place, or that relate to a different injury do not accrue solely on that basis."). The Hayes FTCA claim arises from a single

13

procedure (induction of labor and delivery) performed by a single medical team at a single medical facility over the course of a single day. And regardless, the Hayes' testimony referenced above makes clear that the Hayes held a particularized suspicion that Dr. Chlebowicz's conduct was a probable cause of Iris's injuries. Additionally, Sarah testified she never suspected that any other cause aside from the labor and delivery process might have contributed to her daughter's alleged injuries. (Dkt. 45 ¶ 35; Dkt. 49 ¶ 35).

Furthermore, to the extent the Hayes imply that their claim did not accrue until they learned that Dr. Chlebowicz was a federal employee, the FTCA's statute of limitations is not tolled simply because a plaintiff is unaware that their treating physician is a federal employee. *Arteaga*, 711 F.3d at 831–32 ("The thinking that underlies *Kubrick* and the cases following it, which require knowledge only of injury and of the likely cause of the injury to start the statute of limitations running, is that armed with such knowledge the prospective plaintiff should be able to discover within the statutory limitations period the rest of the facts needed for drafting a complaint that will withstand a motion to dismiss. That the defendant is suable only under the Federal Tort Claims Act is one of those facts."); *P.W.*, 990 F.3d at 522. The Hayes' failure to diligently investigate does not excuse their untimely filing.

Finally, although the Hayes do not explicitly argue such, any purported reliance on the attorney's incorrect advice that they had 8 years to bring a claim does not toll the statute of limitations under the FTCA. *Arteaga*, 711 F.3d at 831–34. In *Arteaga*, multiple attorneys advised the plaintiff incorrectly, one wrongly told her that the Illinois eight-year statute of limitations applied when the Illinois statute does not apply to FTCA claims, and another failed to timely identify that Erie Family Health Center was a federal entity. *Id.* at 830–31. Despite these errors, the Seventh Circuit held that the statute of limitations began to run when Arteaga first suspected a

14

medical treatment-related cause, not when she later discovered federal involvement or received accurate legal advice. *Id.* at 831–34.

The Hayes' FTCA claim accrued no later than the day on which the Hayes began seeking legal advice in 2017 or 2018, if not as early as 2014 when the Hayes began suspecting that the delayed Cesarian section caused Iris's injuries. Even assuming the Hayes' FTCA claim accrued on the last day of 2018, the Hayes' FTCA claim is still time-barred because the Hayes presented the administrative claim to HHS more than two years later in February 2021, at the earliest. Accordingly, the Court grants summary judgment on the Hayes' FTCA claim (Count V) in favor of the United States.

## CONCLUSION

For the above reasons, the Court grants the United States' Motion for Summary Judgment [43] on the Hayes' FTCA claim (Count V) in favor of the United States. The Court further grants summary judgment on the Hayes' claim for family medical expenses under 750 ILCS 65/15 (Count VI) in favor of the United States.[2]

Virginia M. Kendall
United States District Judge

Date: March 30, 2025

---

[2] *Pirrello v. Maryville Acad., Inc.*, 19 N.E.3d 1261 (Ill. App. Ct. 2014) (explaining that such claims are derivative of underlying medical malpractice claims); (Dkt. 44 at 12, n.1).